William D. SELLERS, Jr. and Virginia F. Sellers, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 75–H–782–S.

United States District Court, N. D. Alabama, S. D.

Oct. 1, 1976.

Robert McDavid Smith, John E. Grenier, Lange, Simpson, Robinson & Somerville, Birmingham, Ala., Robert B. Eubank, Sirote, Permutt, Friend, Friedman, Held & Apolinsky, Birmingham, Ala. (of counsel as to Count Two), for plaintiffs.

J. R. Brooks, U. S. Atty., Birmingham, Ala., Jack D. Warren, Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OF DECISION

HANCOCK, District Judge.

This cause came on for consideration by the court on the cross motions for summary judgment filed by the plaintiffs and the defendant herein seeking summary judgment in their respective favors with regard to Count One of the amended complaint. By filing their motions for summary judgment, the parties have represented to the court that there is no genuine issue as to any material fact with regard to the issues presented in Count One of the amended complaint, and the court is of the same opinion.

The court has before it the amended pleadings; the pretrial order entered April 19, 1976 and the exhibits made a part thereof; the affidavit of John S. Jemison, Jr. filed May 17, 1976; the affidavit of William D. Sellers, Jr. also filed on May 17, 1976; the depositions of E. M. Friend, Jr., Thomas E. Bradford, John S. Jemison, Jr. and William D. Sellers, Jr. filed herein, together with their exhibits; and the excellent briefs of counsel. The court hereby finds the following facts established by the foregoing

and proceeds to make the following conclusions of law based thereon.

Since at least 1950 Baggett Transportation Company ("Baggett") has been owned or otherwise controlled by William D. Sellers, Jr. ("Sellers") and his wife, Virginia F. Sellers ("Mrs. Sellers"). Sellers and Mrs. Sellers will collectively be referred to herein as "taxpayers." Baggett is an interstate common carrier of general commodities and explosives based in Birmingham, Alabama, and has for many years hauled explosives for E. I. DuPont Company. At all pertinent times since 1950 C. I. Whitten Transfer Company ("Whitten") has been a common carrier of explosives based in West Virginia which interlined freight (primarily explosives from E. I. DuPont Company) with Baggett. Baggett's largest competitor during this period for this business was Tri-State, a carrier based in Joplin, Missouri.

In 1951 Sellers learned that Charles I. Whitten, who owned Whitten, was ill and desired to sell his business. Sellers was very concerned that Whitten might be sold to Tri-State or to someone closely associated with Tri-State which would have a substantial adverse effect upon Baggett. Since Sellers was of the opinion that the rules of the Interstate Commerce Commission did not permit Sellers or Baggett to acquire Whitten without a hearing culminating in the approval of the acquisition by the Interstate Commerce Commission, and since Mr. Whitten, by reason of his illness, was not interested in a sale which would involve such a delay, Sellers concluded that the next best thing to his ownership of Whitten would be the ownership thereof by a group of local people from Birmingham, Alabama. To this end he formed a group of Birmingham investors, consisting primarily of employees and friends of Sellers, which group acquired the stock of Whitten. The acquisition of Whitten by this group of Birmingham investors continued the close business association theretofore enjoyed by Baggett with Whitten and prevented Whitten from being acquired by Baggett's principal competitor, Tri-State.

In 1953 the group of Birmingham investors indicated to Sellers a desire to sell their Whitten stock. For the same reasons which prompted his 1951 effort to interest a group of Birmingham investors in purchasing Whitten, Sellers worked with a different group of investors toward the acquisition of the Whitten stock from the original group of Birmingham investors. This new group of investors, acting through Olivier Company, Inc. ("Olivier") did acquire Whitten and Sellers worked with the officers of Olivier in arranging mutually beneficial freight interchange agreements between Whitten and Baggett which again had the effect of preventing Whitten from falling into the hands of Tri-State. The arrangement between Whitten and Baggett continued from 1953 until 1966.

In November of 1966 Sellers learned that the stockholders of Olivier wanted to sell either their stock in Olivier or the stock of Whitten held by Olivier. Again, for the same reasons which prompted his 1951 and 1953 interest in seeing that the stock of Whitten be owned by friendly owners and since he was still of the opinion that the rules of the Interstate Commerce Commission prohibited his acquisition of Whitten without an involved hearing and the permission of the Interstate Commerce Commission, Sellers once again sought investors in the Birmingham area friendly to his company who might be interested in purchasing Whitten. The investors he selected were two long time local friends, John S. Jemison, Jr. and Thomas E. Bradford.

A series of meetings between Jemison and Bradford, and their attorney, E. M. Friend, Jr. ("Friend") and Sellers took place during the middle of December, 1966. Out of such meetings the following facts emerged and agreements were made between Jemison, Bradford and Sellers:[1]

---

1. While Exhibit 1 to the pretrial order bears a date of December 15, 1966, and was executed in connection with an earlier effort to acquire Whitten which earlier effort was fruitless, such December 15, 1966 letter still represents a portion of the final agreement of Jemison, Brad-

1. Jemison and Bradford had no knowledge concerning the operation of a carrier and were of the opinion that any acquisition of Olivier (and hence Whitten) should be an equal joint venture between Jemison, Bradford and Sellers, each with one-third interest in the venture both as to original capitalization and as to subsequent contributions should the venture not generate sufficient cash to be self-sustaining.

2. Jemison and Bradford were relying entirely upon the recommendation of Sellers as to whether the acquisition was a sound investment.

3. The acquisition of Olivier was to be accomplished through a corporation, Brad-Jem Corporation ("Brad-Jem"), which was incorporated on December 22, 1966.

4. Jemison, Bradford and Sellers agreed that each would contribute one-third of the total capitalization of Brad-Jem which capitalization was to be a total of $100,000. This capitalization would be represented by $50,000 paid-in common stock contribution and $50,000 loaned to Brad-Jem to be evidenced by promissory notes.

5. Sellers was still concerned with the rule of the Interstate Commerce Commission which prohibited his owning Whitten and consequently it was decided that the $66,666 to be contributed jointly by Jemison and Bradford would be evidenced by all shares of common stock and only *one* $16,666 note being issued in their name and that the $33,333 to be contributed by Sellers would be evidenced by *two* $16,-666 notes being issued in Sellers' name. At such time as Sellers obtained Interstate Commerce Commission approval to own an interest in Whitten, he could exercise an "option" to swap one of the two $16,666 notes (or its cash equivalent) for one-third of the common stock of Brad-Jem. The transaction would not have included an "option" of any kind but for the desire of Sellers to hide from the Interstate Commerce Commission the true nature of the venture. In other words, the basic and dominant reasons Sellers' investment in Brad-Jem was structured in the form of an "option" was to circumvent, if not violate a rule of the Interstate Commerce Commission.

6. The acquisition of Olivier by Brad-Jem was to be structured so that, hopefully, the cash flow generated by Whitten would be sufficient to pay off installment debts incurred by Brad-Jem to acquire the stock of Olivier. Should this not happen, it was agreed that each of the three would contribute one-third of any amounts necessary to pay such debts.

7. As further inducement to Jemison and Bradford to enter the venture, Sellers agreed to their demand that if at any time Jemison and Bradford felt the venture was unsound from their standpoint, all that would be necessary would be for them to notify Sellers that they desired to withdraw, in which event Sellers would reimburse them for their actual costs incurred to that time and they would surrender to Sellers all of their interest in Brad-Jem (and hence, through Olivier, Whitten). In other words, Jemison and Bradford had a right to "put" their two-thirds interest on Sellers, subject to the approval of the Interstate Commerce Commission which approval Sellers agreed to seek in good faith should the "put" be exercised.

8. Since Jemison, Bradford and Sellers each had various corporations through which they made investments from time-to-time, they each agreed that their contribution to the $100,000 capital structure of Brad-Jem could be produced through any such vehicle. Accordingly, Jemison and Bradford, who were each 50% owners of Plantation Patterns, Inc. ("Plantation") caused Plantation to contribute their joint $66,666 to Brad-Jem and caused Plantation to receive from Brad-Jem the common stock issued in exchange for the $50,000 paid-in capital and to re-

ford and Sellers except where inconsistent with the December 18, 1966 meeting described in the December 21, 1966 memorandum of Friend which is Exhibit 2 to the pretrial order.

ceive also the one $16,666 note. Sellers, on the other hand, utilized Highway Equipment Company, Inc. ("Highway") which was owned by his daughters to make his contribution of $33,333 to Brad-Jem and Highway received from Brad-Jem two separate $16,666 notes in exchange therefor.

9. The basic and dominant reason Jemison and Bradford agreed to "let" Sellers have an "option" to acquire his one-third interest in Brad-Jem was simply because he had a one-third present interest and personal stake in the venture from the beginning and the "option" simply represented that present interest. In other words, Jemison and Bradford never really had other than a nominal ownership or control of the one-third interest in Brad-Jem which is the subject of this action.

Following the incorporation of Brad-Jem and its capitalization in accordance with the December meetings outlined above, Brad-Jem purchased all of the outstanding stock of Olivier, whose sole asset was all of the outstanding stock of Whitten. This acquisition was closed on February 25, 1967, and on February 28, 1967, Brad-Jem was merged into Olivier in a downstream merger, so that only Olivier continued to exist thereafter. As a result of the foregoing, Baggett continued to enjoy a favorable interchange agreement with Whitten and prevented Whitten from being acquired by Tri-State.

In 1968 Olivier entered into an agreement and plan of reorganization with U. S. Industries, Inc. ("USI") pursuant to which Olivier agreed to transfer to USI all the Whitten stock in exchange for shares of USI common stock. After this agreement was executed but prior to its implementation, pursuant to the December 1966 agreement between Sellers and Jemison and Bradford, Sellers paid Plantation $16,666 (the face amount of one of the two notes originally issued to Highway which notes had theretofore been paid) and Plantation caused to be transferred to Sellers or his nominee one-third of the capital stock of Olivier which in effect amounted to one-third of the capital stock of Brad-Jem.[2] This occurred on February 3, 1969, and on February 5, 1969, Olivier implemented the agreement with USI by transferring all the Whitten stock to USI in exchange for approximately 142,314 shares of stock of USI.

In February of 1969, Olivier sold 25,500 shares of USI stock for cash and in May of 1969 sold an additional 8,500 shares for cash. After using the proceeds so derived to pay certain creditors, Olivier on August 30, 1969, made a prorata distribution to its shareholders of all its USI stock and all its cash. Sellers received 36,105 shares of USI stock and cash in the amount of $32,667.76 as his prorata share of this distribution, Jemison and Bradford each receiving a comparable amount by virtue of a distribution of twice that amount to Plantation, a corporation owned equally by the two.

Following an audit of the taxpayers' 1969 income tax return, the Commissioner of Internal Revenue determined, as pertinent to the instant motions for summary judgment, that the taxpayers realized unreported compensatory income in the amount of $1,095,063.42 on February 3, 1969, when he acquired record title to one-third of the outstanding stock of Olivier. Taxpayers' income, as reported, was adjusted accordingly, resulting in the payment by taxpayers of an additional $835,409.27 in taxes and $251,034.76 in interest which totals the $1,086,444.03 sought by taxpayers in this action under Count One of their complaint.

The United States of America contends that the December 1966 agreement between Jemison, Bradford and Sellers evidences the grant of a nonstatutory option to Sellers to purchase stock of Brad-Jem (or the stock of the corporation owning directly or indirectly the stock of Whitten), that such option was granted as compensation for services rendered or to be rendered by Sellers, and that upon the exercise of such option on February 3, 1969, and as a result thereof

2. With the Whitten stock about to be transferred by Olivier to USI, the obstacle standing in the way of Sellers openly owning stock in Olivier was about to be removed.

Sellers realized the ordinary income in the amount reflected above by virtue of Sections 1.61–15 and 1.421–6 of Treasury Regulations on Income Tax (1954). Taxpayers, on the other hand, contend that no option is involved in that he was simply acquiring on February 3, 1969, that which he had owned from the inception of the venture between Jemison, Bradford and Sellers and which, but for his understanding that he was prohibited by Interstate Commerce Commission rules from owning Whitten, would have been placed in his name originally. Alternatively, taxpayers claim that even if there were an option present, such option was a noncompensatory option which was coupled with an obligation on the part of Sellers to acquire all the stock of Brad-Jem (Whitten) if the other two investors so desired him to and that he neither performed nor agreed to perform services in consideration for any such option. It will be unnecessary for the court to consider the extent to which, if at all, Sellers agreed to render or rendered services in connection with the venture, or to consider to whom (Brad-Jem or Olivier or Plantation or Jemison and Bradford) any such services were rendered or to be rendered,[3] or to consider for what any such services were rendered or to be rendered. For the court is of the firm opinion that Sellers was under an obligation to "purchase" the one-third interest in Olivier (and indeed was under a contingent obligation to purchase the remaining two-thirds interest), and thus no option is here involved. See Section 1.421–6(b)(1) of Treasury Regulations on Income Tax (1954).

The admonition that form should not contort solid substance has no greater application than in the field of tax law. Here the most significant objective fact which could support a conclusion that Sellers owned only an option to purchase a one-third interest in Brad-Jem is the verbal characterization of that interest as an option to be exercised within five years. While there are a few other less significant facts which tend to support the option theory, the following undisputed objective facts, together with others outlined earlier, compel a conclusion that in substance, even if not in form, Sellers owned a one-third interest in Brad-Jem from the beginning and that he was at some point in time obligated to "exercise" the "option" and cause the one-third interest of Brad-Jem to be registered in his name:

1. The capitalization of Brad-Jem was $50,000 equity and $50,000 debt. The debt was divided into three equal parts of $16,666 and the equity portion was divisible into three equal portions of $16,666. Four of these equal portions (three equity and one debt) were initially transferred to Jemison and Bradford and two of these equal portions (both debt) were initially transferred to Sellers. Each of the three investors initially contributed $33,333 to the venture. The one portion of equity held for Sellers by Jemison and Bradford was to be exchanged for the extra portion of debt (or its cash equivalent) held by Sellers.

2. In addition to the equal contributions of capital, the three investors agreed to share equally the contribution of any additional funds which the venture required.

3. In actuality Sellers was more than a one-third investor in the venture, for he was an underwriter of the entire venture. His two partners, Jemison and Bradford, required him to agree to buy them out of the venture at any time they so desired.

4. At the time the venture was structured, Sellers was of the opinion (whether or not correct is immaterial) that he could not own in his own name any shares of Whitten by reason of regulations of the Interstate Commerce Commission. This was a controlling basis for structuring the venture the way it was structured. Twice before, in 1951 and again in 1953, Sellers was guided by this same proscription of the rules of the Interstate Commerce Commission with regard to his ownership of Whitten.

---

**3.** It should be noted that neither Brad-Jem nor Olivier or Plantation or Jemison or Bradford endeavored to claim a deduction for any alleged compensation flowing to Sellers.

These operative facts and the conclusion drawn by the court therefrom are enforced by the uniform subjective views of the other participants—Jemison (Jemison deposition, pages 12–14) and Bradford (Bradford deposition, pages 12–14, 24, 53 and 78)—together with the attorney who represented Jemison and Bradford, Mr. E. M. Friend, Jr. (Friend deposition, pages 31–32). The consistent and uncontroverted sworn testimony of each of these three persons, as well as that of Sellers, is to the effect that Sellers *purchased* a one-third interest in Brad-Jem at the beginning but could not take record title thereto because of the rules of the Interstate Commerce Commission which prohibited his owning an interest in Whitten. Whether one approves of this subterfuge and circumvention of the rules of the Interstate Commerce Commission should be immaterial to a determination of the substance of the transaction here involved for tax purposes. The propriety of the decision to characterize Sellers' ownership of a one-third interest as an "option" should play no part in a determination of the issue here presented. That issue is simply this: did Sellers have a present one-third equity interest in Brad-Jem from its inception or did he acquire that one-third equity interest only at the time he "exercised" his "option" on February 3, 1969? The court is of the opinion, and so holds, that no option is here involved but that Sellers owned from the inception of the venture with Jemison and Bradford in December of 1966 an equal one-third equity interest and simply elected on February 3, 1969, to vest record title in him to that which he owned since December of 1966. The court further concludes, and so holds, that taxpayers did not realize compensatory income in the amount of $1,095,063.42 on February 3, 1969, when the record title to this one-third equity interest was placed in the name of Sellers. For the foregoing reasons, the taxpayers are entitled to a refund from the defendant of $1,086,444.03 plus interest from April 28, 1975. An appropriate judgment will be entered.

Count Two of the complaint seeks a refund of $63,371.97 in taxes, plus interest in the amount of $13,043.34, which taxpayers claim was illegally and wrongfully assessed against and collected from them by the defendant. The central issues embraced in Count Two concern the treatment for tax purposes of the shares of stock and cash received by the shareholders of Olivier on August 30, 1969, in connection with the liquidation of Olivier. This issue is actually unrelated to the issue embraced in Count One and decided this day. Moreover, it is identical to the issue the court has before it in *General Housewares Corp. v. United States of America*, Civil Action 75–G–2028–S, wherein the plaintiff's claim is derived from the remaining shareholders of Olivier at the time of liquidation. Since the issues involved in Count Two of the complaint in this action present common questions of law and fact with the issues presented in such other action pending in this court, the court contemplates an order will be entered which consolidates for all further proceedings the issues presented by Count Two in the instant complaint with Civil Action 75–G–2028–S. In any event, the remaining issues in this case present a claim separate and apart from the claim resolved hereby, and the court hereby expressly determines that there is no just reason for delay in the entry of a final judgment as to the separate claim in Count One of the complaint and hereby directs the entry of such final judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. An appropriate judgment will be entered.

FINAL JUDGMENT UPON ONE OF MULTIPLE CLAIMS FOR RELIEF PURSUANT TO RULE 54(b) OF THE FEDERAL RULES OF CIVIL PROCEDURE

Pursuant to the Memorandum of Decision this day entered and the express determinations and directions therein contained, it is hereby

ORDERED, ADJUDGED and DECREED that plaintiffs have and recover of defendant the sum of One Million Eighty-Six Thousand Four Hundred Forty-Four and 08/100 Dollars ($1,086,444.03) together

with lawful interest from April 28, 1975, until paid. It is further ORDERED that costs are taxed against defendant.